Filed 2/26/15  P. v. Brooks CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>ROY LESTER BROOKS,<br><br>     Defendant and Appellant. | C072134<br><br>(Super. Ct. No. 11F08623) |

Defendant Roy Lester Brooks was convicted by jury of assault with a firearm, shooting a firearm in a grossly negligent manner, possession of a firearm by a convicted felon, making a criminal threat, and vandalism.  With respect to the assault conviction, the jury also found defendant personally used the firearm.  In a bifurcated proceeding, the trial court found true allegations defendant was previously convicted of three strike offenses within the meaning of the three strikes law.  (Pen. Code, §§ 1170.12, subds. (a)-

1

(d) & 667, subds. (b)-(i).)[1] Granting the People's request to strike two of defendant's prior strikes, the trial court sentenced him to serve 29 years 4 months in state prison.

On appeal, defendant contends: (1) the trial court prejudicially abused its discretion and violated his constitutional rights by (a) allowing the prosecutor to ask leading questions during his direct examination of Carrie Zebley, whom the trial court found to be hostile to the prosecution, (b) restricting defense counsel's use of leading questions on cross-examination, and (c) overruling various other objections to the prosecutor's questioning of Zebley; (2) the trial court also prejudicially abused its discretion by admitting evidence defendant customarily carried a firearm; (3) the cumulative effect of the foregoing assertions of error amounted to a violation of defendant's constitutional right to due process; and (4) the sentence imposed for possession of a firearm by a convicted felon should have been stayed pursuant to section 654.

We disagree with each contention. As we explain, the trial court did not abuse its discretion in determining Zebley to be a hostile witness, allowing the prosecutor to ask her leading questions, and restricting defense counsel's use of such questions. Nor did the trial court abuse its discretion in overruling various other objections defense counsel lodged, specifically that the prosecutor's questioning was repetitive, argumentative, and "should have been halted on Evidence Code section 352 grounds long before the trial court finally took action." On the contrary, the trial court's management of the examination was quite reasonable. We also conclude the trial court did not abuse its discretion in admitting evidence defendant customarily carried a firearm. Having found no error, defendant's claim of cumulative prejudice also fails. Finally, the trial court

---

**1**     Undesignated statutory references are to the Penal Code.

properly imposed and executed sentence on defendant's conviction for possession of a firearm by a convicted felon.

However, as the Attorney General points out, the trial court neglected to impose sentence on defendant's conviction for shooting a firearm in a grossly negligent manner before staying execution of sentence under section 654, resulting in an unauthorized absence of sentence. We conclude the appropriate remedy is to modify the judgment to impose a sentence of 16 months for this conviction, execution of which is stayed pursuant to section 654. As modified, we affirm the judgment.

FACTS

On December 21, 2011, Greg Canterbury was working as a mechanic at Big K Tires on Stockton Boulevard in Sacramento. Canterbury also leased space from Big K's owner, Gerald Bean, to work on additional vehicles. Defendant's car was one such "side job." Around 6:00 p.m., while Canterbury was working on a vehicle for one of Big K's customers, defendant arrived and was "upset" because of the "lack of work being done on his vehicle." Canterbury explained to defendant that he would work on his car later that night. Defendant left. Canterbury then went to dinner with a girlfriend, Carrie Zebley, and one of her friends. They left for dinner in one of Bean's vehicles, leaving Zebley's truck parked at Big K. When they returned from dinner a couple of hours later, they found the windshield of Zebley's truck had been smashed. The windshield of another customer's vehicle was also smashed. A bent steel pipe that appeared to match the damage done to both vehicles was on the ground next to Zebley's truck. Canterbury asked Bean about the vandalism, who "threw his hands up and said it was [defendant]."

About five minutes later, defendant returned to Big K. Canterbury confronted defendant, which led to an exchange of heated profanity and an admission from

3

defendant that he had smashed Zebley's windshield. At some point during the argument, defendant picked up the metal pipe, dropped it again, and walked away from the confrontation. Canterbury then picked up the pipe, intending to use it to smash defendant's windshield. According to Canterbury's testimony, after walking over to where defendant's car was parked, he "decided better of it and threw the pipe over [a] fence." Immediately after throwing the pipe, Canterbury heard a gunshot and turned around to find defendant pointing a gun at him. Defendant was 20 to 30 feet away from Canterbury. Canterbury was "very angry" and started walking towards defendant. He explained: "When I seen he had the gun, I started to walk towards him, and I think I told him to shoot me. And he put the gun away and started heading for the gate." Defendant walked off of the Big K property and then ran down the street.

Meanwhile, Zebley had called 911. Police arrived three or four minutes later. One of the officers spoke with Zebley, who said defendant fired the gun in the air and then pointed it at Canterbury. While Canterbury was talking to a different officer, defendant called his cell phone several times. The officer instructed Canterbury to answer. Canterbury put the call on speaker phone and asked defendant why he fired the gun at him. Defendant answered: "I just wanted to show you who I was." Defendant also called Bean. As Bean explained the phone call: "He was saying that he felt like he messed up and that it was -- if he messed up, and he messed up his life, or whatever, that he was going to do it right, or whatever, you know? That he's going to, basically, come back and finish the job." Bean understood this to mean defendant would come back and shoot both him and Canterbury.

4

DISCUSSION

# I

## *Examination of Zebley*

Defendant contends the trial court prejudicially abused its discretion and violated his constitutional rights by allowing the prosecutor to ask Zebley leading questions during the direct examination, restricting defense counsel's use of leading questions during cross-examination, and overruling certain other objections to the prosecutor's examination of Zebley. We disagree.

## A.

### *Leading Questions During the Direct Examination*

Defendant challenges the trial court's ruling with respect to four "leading" objections made by defense counsel. After providing some additional background, we set forth the challenged rulings and conclude there was no abuse of discretion.[2]

### 1. *Additional Background*

Canterbury and Bean testified that Zebley was Canterbury's girlfriend at the time of the shooting incident at Big K Tires. Zebley confirmed this during her call to 911, in which she told the operator defendant was "mad at [her] boyfriend," and called Canterbury "honey" and "sweetie" during the call. However, Zebley testified at trial that while she and Canterbury had been in a romantic relationship in the past, they were "friends" at the time of the incident and had not seen each other in "a year or so."

---

[2] Defendant also cites "numerous leading questions for which no objection was entered." Because defendant's failure to object forfeits any claim with respect to these questions (see *People v. Pearson* (2013) 56 Cal.4th 393, 426-427), we do not address them specifically. Nevertheless, our conclusion that the trial court did not abuse its discretion in allowing the prosecutor to ask Zebley leading questions also applies to these questions.

According to Zebley, she was at Big K Tires that night simply because she needed her truck repaired. Canterbury testified he broke up with Zebley about a week after the incident and they were no longer on speaking terms. Zebley confirmed in her testimony: "I haven't liked [Canterbury] very much for a long time."

Prior to trial, Zebley contacted the District Attorney's office and spoke with Investigator Joseph Wagstaff. Zebley informed Investigator Wagstaff she wanted to change the statement she gave to police the night of the incident. Zebley stated she was in a romantic relationship with Canterbury that night, but they had since broken up, and she was "not too fond of him" because he was "very mean and abusive towards her." With respect to the shooting incident, Zebley informed Investigator Wagstaff that Canterbury was yelling at defendant while holding the metal pipe and defendant fired the gun "to keep [Canterbury] away or in self-defense."

At trial, while Zebley testified for the prosecution, she did so reluctantly, acknowledging she did not want to be there. She responded to one of the prosecutor's questions with, "I don't want to hear this" and interrupted another question with: "Jesus Christ." When the prosecutor announced he had no further questions, Zebley responded: "Good."

### 2. *The Challenged Rulings*

First, after Zebley testified she did not see defendant pull out a gun the night of the incident, the prosecutor asked: "You told the police officer that [defendant] pulled out a silver handgun; is that correct?" Zebley answered: "The wording to me is awkward. He shot it, and had one in his hand when I looked at him." The prosecutor followed up: "What I'm asking is did you -- you told the police officer you actually saw him pull it out from somewhere on his person?" Defense counsel's leading objection was overruled. Zebley answered: "No." The officer who interviewed Zebley at the

6

scene later testified that she reported seeing defendant pull out a handgun and fire it into the air.

Second, after questioning Zebley about her relationship with Canterbury, the prosecutor asked: "Now, on that evening, you called 911 shortly after the shooting, correct?" Zebley answered: "Right." The prosecutor continued: "And did you do that because you were scared?" Zebley responded: "Yes." The prosecutor asked: "And you told the 911 operator the truth about what you had observed?" At this point, the trial court overruled another leading objection, citing *People v. Spain* (1984) 154 Cal.App.3d 845 (*Spain*). The question was repeated and Zebley answered: "I would hope so, yes." The prosecutor then played Zebley's 911 call for the jury.

Third, the trial court overruled defense counsel's leading objection to the following question: "And as you sit here today, you don't want to have to testify?" Zebley answered: "[N]o, I don't want to be here." She then explained that was "because it's major uncomfortable," but denied being mad at Canterbury.

Fourth, immediately thereafter the prosecutor asked Zebley: "Now, when the police did come, and you spoke to them, you did not tell a police officer anything about [defendant] using self-defense, correct?" Zebley answered: "I don't remember." The prosecutor continued: "You didn't tell the 911 operator anything about [defendant] needing to use self-defense?" Defense counsel again objected as leading. Following a discussion at sidebar, the objection was overruled and Zebley answered: "I don't remember."

At the conclusion of the prosecution's direct examination, outside the presence of the jury, the trial court explained: "I started to allow the People to ask leading questions in conjunction or consistent with [*Spain, supra*, 154 Cal.App.3d 845] because it became apparent to me this really was a hostile witness. [¶] It's strange because she's had,

7

obviously, some kind of good relationship with the victim here, so it's not logical, but they apparently separated, or the victim broke up with her.  Initially, yesterday, I thought the pattern was . . . maybe just strange or unfocused, but it's clear to me as we've gone on that there's deliberate evasion and an attempt to avoid answering the question, so that was my ruling.  I advised counsel on the record, and then, of course, at side bar."

### 3.  *Analysis*

Evidence Code section 767 provides:  "(a) Except under special circumstances where the interests of justice otherwise require:  [¶]  (1) A leading question may not be asked of a witness on direct or redirect examination.  [¶]  (2) A leading question may be asked of a witness on cross-examination or recross-examination."

In *Spain, supra*, 154 Cal.App.3d 845, we explained:  "The danger in allowing 'a question that suggests to the witness the answer that the examining party desires' (Evid. Code, § 764) is to the truth-seeking function of the trial.  Allowing the examiner to put answers in the witness' mouth raises the possibility of collusion [citation], as well as the possibility that the witness will acquiesce in a false suggestion.  [Citation.]  This danger is substantially reduced, however, when it is an adverse witness under cross-examination.  'The purpose of the cross-examination is to sift his [or her] testimony and weaken its force, in short, to discredit the direct testimony.  Thus, not only the presumable bias of the witness for the opponent's cause, but also his [or her] sense of reluctance to become the instrument of his [or her] own discrediting, deprive him [or her] of any inclination to accept the cross-examiner's suggestions unless the truth forces him [or her] to.' [Citation.]" (*Id*. at pp. 852-853.)  Similarly, "permitting the use of leading questions on direct examination when the prosecution is faced with a hostile witness is a special circumstance.  [Citations.]  Because assessment of the circumstances revealing the

8

witness' hostility is uniquely within the realm of the trial court, the use of leading questions on direct examination is committed to the sound discretion of the trial court." (*Ibid*.)

Here, the trial court did not abuse its discretion in determining Zebley to be a hostile witness. While, as defendant points out, Zebley had no relationship with or connection to defendant that would indicate a bias against the prosecution, her open animosity towards Canterbury made her "hostile to the prosecution—that is, inclined to tell as little as [she] [or he] knew of the matter as possible. A witness in that attitude of mind toward the party calling [her] [or him] would not be likely to tell an untrue story favorable to such party merely because questions suggestive of [her] [or his] answers were propounded to [her] [or him]." (*People v. Bliss* (1919) 41 Cal.App. 65, 71.) Moreover, aside from Zebley's hostility, a prosecutor may use leading questions on direct examination to stimulate or revive a witness's recollection or to lay the foundation for admitting a prior inconsistent statement. (*People v. Collins* (2010) 49 Cal.4th 175, 215.) Three of the four leading questions that drew an objection on that ground sought to revive Zebley's recollection as to prior inconsistent statements and served to lay the foundation for admission of such statements. There was no abuse of discretion.

## B.

### *Restriction on Leading Questions During the Cross-Examination*

Defendant also claims the trial court abused its discretion in sustaining three leading objections lodged by the prosecution during defense counsel's cross-examination of Zebley.[3] He is mistaken.

---

[3]  Defendant also notes the trial court sustained an argumentative objection lodged by the prosecutor during defense counsel's cross-examination of Zebley. Because he

9

Returning to *Spain*, *supra*, 154 Cal.App.3d 845, the fact a witness is hostile to the prosecution does not, by itself, mean the defendant should be foreclosed from asking that witness leading questions during cross-examination. This is because "the witness may be hostile to the prosecution for a reason other than favoritism to the defense." (*Id*. at p. 853.) There, the hostile witness was the defendant's mother, who admitted to lying at the scene of the crime to protect her son. (*Id*. at p. 852.) We held the trial court did not abuse its discretion in restricting the use of leading questions during cross-examination, explaining: "[T]he rationale behind the restriction in Evidence Code section 767 is that '[w]hen the danger [of false suggestion] is present, leading questions should be prohibited; when it is absent, leading questions should be allowed.' [Citation.] The legislative committee comment to Evidence Code section 767 expresses the same rationale in a manner directly applicable to this case: 'The court may also forbid the asking of leading questions . . . where the witness is biased in favor of the cross-examiner and would be unduly susceptible to the influence of questions that suggested the desired answer.' [Citation.] . . . In defendant's mother the trial court was faced with a witness who had demonstrated her obvious and natural bias in favor of defendant. We find no abuse of discretion in the decision to restrict the defendant's use of leading questions." (*Id*. at p. 854.)

This case does not present the classic situation of a hostile witness with an obvious bias in favor of the defendant, a fact the trial court appears to have understood quite well. At the close of the prosecution's direct examination, the trial court explained its ruling regarding Zebley's status as a hostile witness and informed defense counsel: "I have the authority here of course to foreclose leading questions on the defense. I'm not doing that

fails to offer any argument concerning the propriety of this ruling, any claim of error he might have had is forfeited. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

10

at the outset, but I'm just going to evaluate it. If she starts turning into a -- like a slot machine for you, I'll probably extend that ruling to limit you, but I haven't done that yet, from asking leading questions." Without objection from the prosecutor, defense counsel asked Zebley several leading questions, most of which she answered with: "Yes." The prosecutor's first leading objection came after defense counsel asked Zebley: "Did you and [Canterbury] fail to mention to the police that there was a pipe because you were concerned that [Canterbury] would get in trouble?" The prosecutor then objected to leading questions about whether Zebley was "confused" during her testimony on direct examination, and more specifically, whether she was "confused" when she answered the prosecutor's questions about her statement to Investigator Wagstaff. The objections were sustained and the answers stricken. Thus, the trial court took a wait-and-see approach, initially allowing leading questions during the cross-examination and restricting their use only after Zebley answered "yes" to nearly every leading question posed by defense counsel. While Zebley had no discernible bias in favor of defendant, our review of the record reveals she was as compliant when examined by defense counsel as she was evasive when examined by the prosecutor. It makes no difference whether her attitude towards testifying came from bias in favor of defendant or animosity towards the victim. Allowing leading questions during cross-examination presented a danger of false suggestion. There was no abuse of discretion.

## C.

### *Other Objections to the Prosecutor's Examination of Zebley*

We also reject defendant's claim the trial court abused its discretion in allowing the prosecutor to ask "repetitive, badgering, and argumentative questions." Specifically, he challenges the trial court's ruling with respect to seven "asked and answered"

11

and/or "argumentative" objections and one objection made under Evidence Code section 352.

### 1. *The Challenged Rulings*

First, as mentioned, Zebley testified she did not see defendant pull out the gun. The prosecutor then asked, three times, whether she told the police officer defendant pulled out the gun. In addition to making a leading objection, defense counsel also objected to the question on the ground it had been asked and answered. This objection was also overruled. For good reason. While the question was asked three times, it was not until the third attempt that Zebley answered the question. We discuss this ruling no further.

Second, after playing Zebley's 911 call to the jury, the prosecutor asked: "You just heard your phone call, okay? And in that phone call, isn't it true you never said anything at all about [defendant] needing to use self-defense against [Canterbury]?" After defense counsel's argumentative objection was overruled, Zebley answered: "I have a short-term memory problem, so I'm trying really hard to -- no, you're right, I guess. I don't know."

Third, during the prosecution's redirect examination, after Zebley acknowledged she told Investigator Wagstaff defendant fired the gun to keep Canterbury from advancing with the pipe and later testified at the preliminary hearing she did not believe defendant fired to keep Canterbury from advancing, the prosecutor asked: "When you testified at the preliminary hearing, then, are you now testifying that the answers you gave were not the truth?" Defense counsel's argumentative objection was overruled. Zebley answered: "I'm saying -- I'm saying that, obviously, I was confused, and I still am."

12

Fourth, immediately thereafter the prosecutor read a question that was asked of Zebley during the preliminary examination—" 'At the time that you heard the gunshot, was it your perception and observation that the person firing the gun was trying to keep [Canterbury] from advancing toward him?' "—and asked, "what part of the question was confusing." After the trial court overruled defense counsel's objection that the question was argumentative and had been asked and answered, Zebley answered: "At the time -- at the time that -- at that time, that wasn't my perception. When I looked at it later, that was my perception."

Fifth, a short time later, the prosecutor asked: "So when you came to court before, you weren't sure about what you were thinking?" The trial court overruled another argumentative objection. Zebley answered: "Right."

Sixth, during the prosecution's re-redirect examination, after Zebley admitted testifying during the preliminary hearing that a copy of the statement she gave to Investigator Wagstaff was "not how [she] had said it," the prosecutor asked whether she was "saying to the court [her] statement was not accurate." Defense counsel objected: "Leading, relevance, [Evidence Code section] 352 at this point." After the objection was overruled, Zebley answered: "I don't know what -- I don't see what -- I don't see what part of it I was talking about that wasn't accurate, but I do remember saying -- thinking that, but I think I was refraining (sic) to the wording, and I don't know what it is here."

Seventh, after Zebley admitted her statement to Investigator Wagstaff was different from that made to the 911 operator, to police at the scene, and during the preliminary hearing, the prosecutor asked: "So fair to say, ma'am --" Zebley interrupted with: "God, this is --" The prosecutor continued: "what you think about this case changes from week to week?" Defense counsel lodged another argumentative objection.

13

Zebley responded: "Wow." After the objection was overruled, Zebley answered: "No, it doesn't change from week to week."

Eighth, the prosecutor asked: "[Y]ou said that it was your belief that [defendant] had to fire a gun to keep [Canterbury] from advancing, but then two weeks later, you testified to something opposite; is that true?" Defense counsel objected that the question was argumentative and had been asked and answered. The trial court stated: "I'm going to start sustaining those objections on [Evidence Code section] 352 grounds. Restate the question one last time, and move forward." The prosecutor then asked: "Isn't it true, ma'am, you've changed your version of events over time depending on how you felt about [Canterbury] at the time?" Zebley answered: "No." The prosecutor then ended his examination of Zebley.

## 2. *Analysis*

"An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer. The question may, indeed, be unanswerable. . . . An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all." (*People v. Chatman* (2006) 38 Cal.4th 344, 384.) Here, each of the prosecutor's questions objected to on argumentative grounds sought to elicit competent testimony from Zebley concerning her prior statements and purported confusion. The trial court did not abuse its discretion in allowing the questions.

With respect to defendant's claim that "the trial court allowed the prosecutor to ask Zebley, a confused but not hostile witness, essentially the same question repetitively and without surcease, through direct, redirect, and re-redirect examination

14

over [his] numerous objections," we note we have already concluded Zebley was a hostile witness subject to impeachment by the prosecution (see *People v. Tuggles* (2009) 179 Cal.App.4th 339, 358), placing her in a position analogous to a defense witness being impeached by the prosecution during cross-examination. "Although a court should not, over objection, permit an attorney 'to carry . . . witnesses with ceaseless reiteration through endless matters concerning which they had testified that they knew nothing' [citation], often some amount of repetition is the essence of effective cross-examination. 'More latitude should be granted to a cross-examiner asking the same question more than once than is permitted the direct examiner. One major purpose of cross-examination is to continue probing the same subject matter in an effort to get a witness possibly to modify his or her testimony. There is good reason, therefore, to permit the cross-examiner to ask a witness the same question more than once.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1197.) Here, while the trial court allowed the prosecutor to repeat questions concerning Zebley's prior inconsistent statements, "as soon as the [questioning] 'threatened to become unduly repetitious and unproductive,' " the trial court advised the prosecutor it would begin sustaining defense counsel's objections. (*People v. Mayfield* (1997) 14 Cal.4th 668, 756.) We conclude the trial court did not abuse its discretion in overruling defendant's asked and answered objections.

Finally, we also reject defendant's assertion the trial court should have sustained his Evidence Code section 352 objection, which was lodged *a page and a half* in the reporter's transcript before the trial court announced it would start sustaining objections on this ground, prompting the prosecutor to end his examination of Zebley. While defendant argues, "the endless impeachment of Zebley was cumulative and inflammatory and should have been halted on Evidence Code section 352 grounds long before the trial

15

court finally took action," he did not object on this ground long before the trial court took action. We have already concluded the trial court acted within its discretion in allowing the prosecutor to use repetition in impeaching Zebley with prior inconsistent statements. Such impeachment was neither cumulative nor inflammatory. However, about the time the objection was lodged, the questioning was starting to lose its usefulness. The trial court certainly could have sustained the objection at this point. But we cannot conclude it was an abuse of discretion to allow four more questions before indicating future objections would be sustained.

In sum, the trial court did not abuse its discretion in determining Zebley to be a hostile witness, allowing the prosecutor to ask her leading questions, and restricting defense counsel's use of such questions. Nor did the trial court abuse its discretion in overruling defense counsel's specific objections that the prosecutor's questioning was repetitive, argumentative, and should have been stopped on Evidence Code section 352 grounds four questions before the trial court indicated it would begin sustaining such objections. Having found no abuse of discretion, we also reject defendant's additional assertion, raised for the first time on appeal, that the trial court's rulings "violated [his] Fourteenth Amendment right to due process and a fair trial." While defendant is correct his new constitutional argument is not forfeited, "rejection on the merits of a claim that the trial court erred on the issue actually before the court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 990, fn. 5.)

16

## II

### *Admission of Evidence Defendant Carried a Firearm*

Defendant also claims the trial court prejudicially abused its discretion by admitting evidence he customarily carried a firearm. We are not persuaded.

### A.

### *Additional Background*

During a hearing outside the presence of the jury, Bean testified he had known defendant for about 20 years. Bean never saw defendant with a gun. However, on several occasions, defendant told Bean he had a gun. About a month before the shooting, defendant told Bean he kept a gun in his car. Defendant also mentioned having a gun in his car on two other occasions within the six-month period prior to the shooting. Bean also testified he received a phone call from defendant immediately after the shooting in which defendant said "he was coming back to finish the job." Bean further testified his son told him there was a shooting incident at his house the same night as the shooting at Big K Tires. Bean's son reported he looked out of a window at the house, saw defendant in a truck outside, and when he turned and walked away from the window, he heard four gun shots and the sound of a truck driving off. Finally, Bean stated that testifying against defendant made him concerned for his safety and that of his family.

Defense counsel objected to the admission of "all of this" under Evidence Code section 352, specifically, "the prejudice outweighing any relevance." Defense counsel also suggested defendant would enter a plea of no contest or guilty to the criminal threats charge to avoid admission of this evidence, explaining "all this evidence seems to go to his fear and reasonable belief." The trial court then asked the prosecutor whether he would seek to admit the testimony as evidence of defendant's "consciousness of guilt, even if [defendant] entered a plea." The prosecutor said he would. The trial court then

17

offered to take defendant's plea, but stated, "it doesn't change the case because that's extraordinarily powerful evidence that he's calling people and threatening them. And I'm not talking about the witness's state of mind now, I'm just talking about good old fashioned consciousness of guilt." Defense counsel then objected specifically to the testimony concerning defendant customarily carrying a firearm, stating, "if he pled to [the criminal threats charge], I don't think that's relevant in the trial any longer." The trial court overruled the objection.

Later, after discussing the admissibility of a certain prior conviction, the trial court asked defense counsel whether defendant still wanted to enter a plea with respect to the criminal threats charge. Defense counsel said he did not know because he was not sure what would come into evidence if defendant pled to the criminal threats charge as opposed to what would come into evidence if he did not. The trial court then further explained its evidentiary rulings. First, the trial court explained the phone call defendant made to Bean the night of the shooting and his prior statements to Bean concerning the fact he carried a firearm were relevant, not only to prove the criminal threats charge, but also to establish Bean's credibility as a witness. Second, the trial court explained defendant's threatening phone call was "possibly more relevant" to the issue of defendant's "consciousness of guilt with regard to his conduct at the scene." Third, with respect to the shooting that occurred at Bean's house after the incident at Big K Tires, the trial court explained: "There is no appropriate evidence here to indicate to the jury that [defendant], or his agents or friends or associates, did the shooting. And therefore, he would be entitled to an admonition that there is no evidence to that effect, and they cannot consider the shooting in this regard. But there is evidence that can come in, state of mind exception. 'My son told me the house was shot at.' That affects this gentleman's credibility. He's coming forward and testifying after he's been threatened

18

on the phone and after somebody shot [at] his house.  And that's a factor that the jury is entitled to hear in evaluating his credibility."  Defense counsel did not further mention the possibility of defendant entering a plea to the criminal threats charge.

Thereafter, Bean testified in accordance with the trial court's ruling.  He described the threat, explained he considered the threat to be "very serious" because defendant had previously told him he carried a gun, and also described the shooting reported by his son, although he omitted the fact his son said defendant was outside the house immediately before the shots were fired.  Bean then testified he was afraid there would be retaliation should defendant be released from custody.

The jury was instructed on the limited purpose of Bean's testimony as follows: "There has been testimony from Gerald Bean that:  [¶]  One, there was a subsequent shooting at his house; and,  [¶]  Two, that [defendant] told [Bean] on prior occasions that he possessed a firearm.  [¶]  You must not consider this testimony for the truth of the matter.  [¶]  You may not use this evidence to infer that [defendant] possessed a firearm on [the day of the alleged shooting incident].  [¶]  You may consider how [Bean's] fear of retaliation or fear of testifying affected his demeanor and credibility as a witness.  [¶] You may also consider the evidence that [defendant] told [Bean] on prior occasions that he possessed a firearm in evaluating [Bean's] fear and the reasonableness of such fear as it relates to [the criminal threats] charge."

**B.**

*Analysis*

Defendant argues the trial court prejudicially erred by admitting into evidence his statements to Bean that he carried a firearm "as evidence of consciousness of guilt or to support [Bean's] credibility."  He does not deny such evidence was relevant and admissible to prove the crime of criminal threats.  Nor could he.  Among the five

19

elements of the crime are: "(4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 228, quoting § 422.) " 'The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear. [Citation.]' " (*People v. Wilson* (2010) 186 Cal.App.4th 789, 808, quoting *People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) Here, the fact defendant told Bean he carried a firearm is relevant to the question of whether his threat placed Bean in a state of sustained fear and, if so, whether this fear was reasonable. It was clearly admissible for this purpose.

In an attempt to get around the admissibility of the evidence, defendant argues: "Had the trial court not found an alternative basis—in addition to . . . section 422—to support Bean's testimony that he knew [defendant] regularly carried a firearm," he "would have entered a guilty plea to . . . section 422 and the testimony would have been irrelevant and inadmissible." As a preliminary matter, we disagree with defendant's assertion the trial court admitted his statements to Bean concerning carrying a firearm as evidence of consciousness of guilt. The trial court admitted defendant's *threat to Bean* under this alternative theory of admissibility. This ruling is not challenged on appeal. Defendant's *statements to Bean concerning carrying a firearm* were made prior to the shooting and, therefore, could not possibly evidence defendant's consciousness of guilt with respect to a crime he had not yet committed.

However, as the trial court correctly observed, such statements were relevant to the question of Bean's credibility as a witness. Indeed, defendant acknowledges the following to be a correct statement of the law: "A witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake

20

in the testimony. Just as the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility [citation], the fact a witness is testifying despite fear of recrimination is important to fully evaluating his or her credibility." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368-1369.) Here, Bean's belief defendant routinely carried a firearm was relevant to his fear of testifying against defendant. Nevertheless, defendant argues the jury heard testimony "that [he] had a gun and fired a shot in the air during the disagreement" with Canterbury and "that his house had been shot up after the incident. Under these circumstances, testimony that Bean was aware that [defendant] customarily carried a gun had little or nothing to add to evaluation of Bean's credibility and demeanor at trial." Thus, argues defendant, the trial court should have excluded this evidence under Evidence Code section 352 as "cumulative" and "extraordinarily prejudicial." We are not persuaded.

We note that because defendant is a convicted felon, his statements to Bean that he carried a firearm can be considered admissions of criminal behavior, i.e., he was committing the crime of being a felon in possession of a firearm. While the trial court instructed the jury not to consider the truth of these out-of-court statements, we nevertheless acknowledge the inherent prejudice in such statements. "Even if evidence of other crimes is relevant under a theory of admissibility that does not rely on proving disposition, it can be highly prejudicial. 'Regardless of its probative value, evidence of other crimes always involves the risk of serious prejudice. . . .' [Citation.] Therefore, the law places other restrictions on its admissibility." (*People v. Thompson* (1980) 27 Cal.3d 303, 318.) Relevant here, Evidence Code section 352 provides for the exclusion of otherwise admissible evidence if its probative value is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Since 'substantial prejudicial effect [is]

21

inherent in [other crimes] evidence,' uncharged offenses are admissible only if they have substantial probative value." (*Thompson, supra,* 27 Cal.3d 318.) We conclude the evidence had substantial probative value with respect to both proving the criminal threats charge and providing the jury with an accurate and complete picture of the circumstances giving rise to Bean's fear of testifying against defendant.

There was no abuse of discretion.

### III

### *Cumulative Prejudice*

Having found no error, prejudicial or otherwise, we also reject defendant's assertion the cumulative effect of the foregoing claims of error amounted to a violation of his constitutional right to due process. (See *People v. Boyer* (2006) 38 Cal.4th 412, 489.)

### IV

### *Double Punishment*

Finally, defendant contends the sentence imposed for possession of a firearm by a convicted felon should have been stayed pursuant to section 654. He is mistaken.

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "The purpose of this statute is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although these distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one of the separate offenses arising from the single act or omission—the offense carrying the highest punishment." (*People v. Hutchins*

22

(2001) 90 Cal.App.4th 1308, 1312; *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1345.)

"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another point in *People v. Correa* (2012) 54 Cal.4th 331, 338; *People v. Britt* (2004) 32 Cal.4th 944, 951-952.) However, "where a defendant entertains multiple criminal objectives independent of and not merely incidental to each other, he [or she] may be punished for more than one crime even though the violations share common acts or are parts of an otherwise indivisible course of conduct." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

Moreover, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.) In determining whether criminal offenses are temporally divisible, courts consider whether the defendant had an "opportunity to reflect and to renew his or her intent before committing the next [offense], thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) This is because the purpose of section 654 is "to insure that a defendant's punishment will be commensurate with his [or her] culpability." (*People v. Perez* (1979) 23 Cal.3d 545, 552.)

"The trial court has broad latitude in determining whether section 654, subdivision (a) applies in a given case. [Citations.]" (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1564.) "Its findings on this question must be upheld on appeal if there is any substantial evidence to support them. [Citations.]" (*People v. Hutchins*,

*supra*, 90 Cal.App.4th at p. 1312; *People v. Tarris* (2009) 180 Cal.App.4th 612, 626.) "We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).)

Defendant relies on *People v. Venegas* (1970) 10 Cal.App.3d 814 (*Venegas*) in support of his argument the trial court should have stayed execution of sentence with respect to his conviction for possession of a firearm by a convicted felon. There, the defendant (Venegas) shot his friend (Rodriguez) at a bar. There was no evidence Venegas possessed the gun prior to shooting Rodriguez and the defense presented evidence he obtained it during a struggle moments before the shooting. (*Id.* at pp. 818-819.) The Court of Appeal held multiple punishment for assault with a deadly weapon and possession of a firearm by a convicted felon was prohibited by section 654, explaining: "Here the evidence shows a possession only at the time [Venegas] shot Rodriguez. Not only was the possession physically simultaneous, but the possession was incidental to only one objective, namely to shoot Rodriguez." (*Id.* at p. 821; see also *People v. Bradford* (1976) 17 Cal.3d 8, 22-23 [multiple punishment for assault with a deadly weapon and possession of a firearm by a convicted felon prohibited by section 654 where the defendant, stopped by the highway patrol for speeding, took the officer's revolver and fired upon the officer].)

Thus, "multiple punishment is improper where the evidence 'demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense . . . .' " (*Jones*, *supra*, 103 Cal.App.4th 1139, 1144, quoting *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1412.) However, "multiple punishment is proper where the evidence shows that the defendant possessed the firearm before the crime, with an independent intent." (*Jones*, *supra*, at p. 1144.)

24

For example, in *Jones*, *supra*, 103 Cal.App.4th 1139, the defendant (Jones) was convicted of shooting at an inhabited dwelling and possession of a firearm by a convicted felon. Jones and another man drove to Jones's ex-girlfriend's house. While Jones stayed in the car, the other man rang the doorbell and was told the ex-girlfriend was not home. They then left in the car and returned 15 minutes later. From the passenger seat, Jones fired several shots at the house. (*Id*. at pp. 1141-1142.) The Court of Appeal held section 654 did not preclude multiple punishment in these circumstances, explaining: "[T]he evidence was sufficient to allow the inference that Jones's possession of the firearm was antecedent to and separate from the primary offense of shooting at an inhabited dwelling. It strains reason to assume that Jones did not have possession for some period of time before firing shots at [his ex-girlfriend's] home. Any other interpretation would be patently absurd. Jones committed two separate acts: arming himself with a firearm, and shooting at an inhabited dwelling. Jones necessarily had the firearm in his possession *before* he shot at [his ex-girlfriend's] house, when he and his companion came to the house 15 minutes before the shooting, or, at the very least, when they began driving toward the house the second time. It was therefore a reasonable inference that Jones's possession of the firearm was antecedent to the primary crime. [Citation.] [Former] [s]ection 12021 is violated whenever a felon intentionally has the weapon in constructive or actual possession. [Citation.] Jones necessarily must have had either actual or constructive possession of the gun while riding in the car, as evidenced by his control over and use of the gun during the shooting. Jones's violation of [former] section 12021 was complete the instant Jones had the firearm within his control prior to the shooting. [Citation.]" (*Id*. at p. 1147.)

The court continued: "The evidence likewise supported an inference that Jones harbored separate intents in the two crimes. Jones necessarily intended to possess the

25

firearm when he first obtained it, which, as we have discussed, necessarily occurred antecedent to the shooting. That he used the gun to shoot at [his ex-girlfriend's] house required a second intent *in addition* to his original goal of possessing the weapon. Jones's use of the weapon after completion of his first crime of possession of the firearm thus comprised a 'separate and distinct transaction undertaken with an additional intent which necessarily is something more than the mere intent to possess the proscribed weapon.' [Citation.]" (*Jones*, *supra*, 103 Cal.App.4th at pp. 1147-1148.) Finally, the court explained: "[P]rohibiting multiple punishment under the circumstances presented here would not further the policies underlying section[] 654 and [former section] 12021. Section 654's purpose is to ensure that punishment is commensurate with a defendant's culpability. [Citations.] This concept 'works both ways. It is just as undesirable to apply the statute to lighten a just punishment as it is to ignore the statute and impose an oppressive sentence.' [Citation.] [Former] [s]ection 12021 uniquely targets the threat posed by felons who possess firearms. [Citation.] We see no reason why a felon who chooses to arm himself or herself in violation of [former] section 12021 should escape punishment for that offense because he or she uses the firearm to commit a second offense." (*Id*. at p. 1148.)

Here, like *Jones, supra*, 103 Cal.App.4th 1139 and unlike *Venegas, supra*, 10 Cal.App.3d 814, the evidence supports a reasonable inference defendant possessed the firearm prior to firing the weapon at Big K Tires. While we do not know whether defendant had the gun when he arrived the first time and argued with Canterbury about fixing his car, or whether he had it when he arrived the second time and smashed Zebley's windshield with the pipe, defendant must have had the gun when he entered the Big K lot the third time. This inference flows from the fact Canterbury confronted defendant about the vandalism immediately upon his return to the shop. There was no

26

physical struggle between defendant and Canterbury or anyone else during which defendant could have grabbed a gun. After a heated argument, Canterbury walked over to defendant's car with the pipe and defendant fired the gun into the air and then pointed it at Canterbury. On these facts, in order to conclude defendant did not possess the gun prior to the shooting, at the very least while he walked back to Big K Tires after committing the vandalism, we would have to assume the gun just happened to be lying around where defendant was standing as Canterbury walked over to his car with the pipe. As in *Jones, supra*, 103 Cal.App.4th 1139, such an assumption strains reason. Thus, for the reasons articulated in *Jones*, we conclude multiple punishment was proper in this case.

## V

### *Modification of the Judgment*

The Attorney General points out the trial court neglected to impose sentence on defendant's conviction for shooting a firearm in a grossly negligent manner prior to staying execution of that sentence under section 654. Thus, the trial court effectively stayed *imposition* of sentence. As we explained in *People v. Alford* (2010) 180 Cal.App.4th 1463, this "results in an unauthorized absence of sentence." (*Id*. at p. 1472.) As in that case, we conclude the appropriate remedy is to modify the judgment. (*Id*. at pp. 1473-1474.) We hereby impose a sentence of 16 months for this conviction (one-third the middle term of two years (eight months), doubled to 16 months pursuant to sections 1170.12, subdivision (c)(1), and 667, subdivision (e)(1)), execution of which is stayed pursuant to section 654. As modified, we affirm the judgment.

### DISPOSITION

The judgment is modified by imposing a sentence of 16 months for defendant's conviction for shooting a firearm in a grossly negligent manner (Count 2), execution of

27

which is stayed pursuant to Penal Code section 654.  The modified judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.


      HOCH    , J.


We concur:


      ROBIE    , Acting P. J.


      BUTZ    , J.